The next case for argument is 23-1273, Michael Stapleton v. United States. Mr. Bradel. It's Bradel, Your Honor. Good afternoon, Your Honors. Ryan Bradel on behalf of Michael Stapleton. May it please the Court. This Court has robust precedence on the deference that the trial court owes to an agency's decision. That deference has to mean something. As this Court said in Dell, the Federal Circuit has to review the standard that the Court of Federal Claims applied, not just the standard that the Court of Federal Claims recited. What is our review of what the Court of Claims does and what deference, if any, is owed to fact-finding and that sort of thing? The basic standard of review is de novo. There's no deference to the fact-finding that the Court of Federal Claims found required in this case. That's because what the Court of Federal Claims was doing was it was reviewing the agency decision and it was reviewing it for arbitrariness and comprehension. So are we, in essence, reviewing the agency decision for arbitrariness and comprehension? That's correct. And that's what this Court said in Turner, as well as Bannum, is that the Federal Circuit is essentially reviewing the agency decision anew for arbitrariness and comprehension. That's just for whether there was a procurement violation, right? Once the Court determines there's a procurement violation and whether there's prejudice to the protester is a fact question for the trial court that we'd review deferentially. That's correct, Your Honor, and that's a standard articulated in Bannum. Was there a prejudice part of the Claims Court's decision in this case, or is it all ... Yeah. Your Honor, there was a prejudice piece with regard to the issue related to the male security specialist. I'm going to try to avoid saying his name because it's confidential, but the issue with the male security specialist, the Court of Claims never actually made a determination of prejudice related to that issue. However, with the rest of the decision, there's no issue with regard to prejudice. The Court didn't make any findings regarding prejudice, and the prejudice issue is not really in dispute. A good deal of this confuses me, but I want to ask you if this is possible. As I understand it right, this term, organizational conflict of interest, has to be reduced to some very concrete things, and I want you to correct everything that I say that's wrong, but that the concrete issues have been described in two buckets. One is unequal information, and the other is this biased ground rule, some of which actually sounds like unequal information. There's those questions all about what led to the 2020 solicitation and the award based on it, and then what led to the 2022. I guess I'm interested in hearing very concretely what the specific unequal information issues were and what specifically the biased ground rules. The biased ground rule one is the one that I've had the hardest time pinpointing what specifically was going on. What the bias even was, let alone what its effects were. That's a fair question, Your Honor, and I think that is part of the problem with the Court of Claims decision, is that it never found... I'm sorry. No, no. If we're doing a de novo, why don't you go directly to what the charges were, as opposed to what the Claims Court found about them? I understand. Contract Officer Franklin, initially, in the initial OCI review that took place in 2021 regarding the 2020 solicitations, he said the biased ground rules arose from four things. And we kind of addressed this in our brief at pages 11 and 12, in our opening brief and reply brief at 16 and 17, but there were four things. There was an internal audit control document. There was the best practices speed of mail document. There was a playbook, and there was a program fundamentals document. Can you actually now describe each of those four things, please? Sure. So the internal audit control document had to do with the ways in which the contractor was doing the audits of its performance of the explosive detection. The best practices and the speed of mail document. I don't think you appreciate just how much I need to go down to ABCs. There's a document. There are lots of documents. Tell me why it has something to do with ground rules. When I hear the word ground rule, I think there was a requirement in the solicitation. The bidders both saw the same requirement, but there was something wrong with including that requirement because it was somehow unfairly biased in favor. Its inclusion, perfectly understandable, no difference in access to information about it, but one party, MSA, must have had a capability that was different from the capability that the other bidders had and therefore an easier ability or greater ability to meet that particular requirement in a way that's improper as opposed to perfectly proper because maybe it's just a justified requirement. Now, what does that have to do with this audit thing? Well, Your Honor, that's exactly our position. No, no, that's not helpful. Was there a ground rule in the solicitation having to do with this audit thing? Our position is no. MSA's position is that these documents never created a biased ground rule. And the SDRO, which is the Postal Service's... Let me just try one more time. Put aside the term bias. To understand whether there was a biased ground rule, the first thing I need to be told is, what is the ground rule that is asserted to be biased? Don't tell me whether it's biased or not. Just tell me what the ground rule is. In this case, there was no ground rule related to the internal audit. But what did the other side assert was the ground rule? Your Honor, I'm not sure that they ever did. I mean, their whole case was MSA... was the ground rule. Once again, Your Honor, the Court of Federal Claims never made that finding either. Then why are we talking about biased ground rules? Because the Court of Federal Claims said that MSA has to be disqualified because there were biased ground rules. And what were the biased ground rules the Court identified? The Court never identified any. I mean, that's the problem with the Court's... That's a big problem. That's the problem with the Court's opinion. I mean, the Court said that MSA was involved in this pilot program and the pilot program influenced the 2020 solicitations. And some of the documents in the Postal Service in its OCR review said, well, MSA never touched the statement at work. But they did help create these documents. The internal audit control documents, speed of mail, playbook, program fundamentals. And the Court of... So is that what we're talking about when we're talking about ground rules? That's correct, Your Honor. But they had an unfair advantage because they had had this participation in developing all these documents that were relevant to how this program was going to work. That's exactly correct, Your Honor. And with respect to what ground rule did MSA's participation have an unfair advantage? The Court never made a finding. Was there an allegation that there was some ground rule, namely a requirement of the solicitation or something in the solicitation that was going to affect who won the competition? Well, no. I mean, the answer is no. Nobody made a specific allegation regarding a ground rule. What the other side said, and now I'm kind of making their argument for them, is that these documents influenced how the work was to be performed. For example... Who cares? I mean, I know I'm making your argument for you, but who cares if it influenced how it was going to be performed as long as both of you had an equal chance to perform it? I completely agree, Your Honor. And that's the problem with the Court of Federal Claims' decision is that it never actually... Are there stronger arguments on the unequal access to information problem? Let me make the argument. I mean, the argument I understood and the confusion I have, one of the issues of confusion I have is the solicitation in 2020 and the solicitation in 22, and half the time I wasn't sure what we were talking about for which period. But at the end of the day, you were all involved in this pilot program which morphed into what you thought was going to be a sole solicitation, which I assume... So you had access to all the information. You also set it all up. And presumably the setup at the airports and the number of dogs, et cetera, you were all in on that, right? I don't know that I agree that we were all in on it. I mean, we performed a pilot program that demonstrated to the Postal Service how this would work. Okay, but then, well, even after the 2020 thing, you were performing this work, and so you had a leg up to the other competitors. So could I ask you a similar question, which is what's unclear to me globally is you've got in the government, you get contractors, and then when they have a second bid and another previous incumbent gets to bid, how is the advantage that people were saying you had here from your action different than what an existing contractor here who bids, rebids on a contractor and he's the incumbent? How is that different than incumbency? Well, Your Honor, we don't think it is different. I mean, we think that whatever advantages MSA may have had with regard to the 2022 solicitations were the natural advantages of incumbency, right, that came from having performed the pilot program, which nobody said was improper. Now, I'm sure my other friends' arguments are going to be, well, MSA never should have had the 2020 contract. It gained experience from performing the 2020 contract. Therefore, we have to mitigate that somehow. When it comes to the 2022 contract, because the 2020 contract was improperly obtained by MSA. And the government agreed to that, right? I don't know that the government necessarily agreed. The Postal Service did take steps to mitigate MSA's past performance advantage and other advantages that it obtained from performing the 2020 contract. So, yes, that's correct. I don't want to throw out names because, as you said, some of them are confidential. But there was some agreement that something had gone awry. So that didn't seem to be in dispute by 2022. I think it then became the issue before the Court of Claims whether or not the actions taken to mitigate those problems were sufficient. And I'll just throw out another question to start the discussion on this. I understood the Court of Federal Claims. concluded that it was immedicable, whatever that word is. That's correct, Your Honor. But I thought in other places the Court of Federal Claims seemed to evaluate the sufficiency of the mitigation. To me, though, it seems like it's either one or the other. So how do you construe what the Court was saying? Yeah, you raise a good point, Your Honor. So I think the Court of Federal Claims said that the biased ground rules was I disagree with that. But the Court said that the unequal access to information is not immutable. They didn't say that specifically, but they implied it, that the unequal access to information could have been mitigated. But if that had been mitigated, but the biased ground rules, again, whatever they were, were not mitigable, then the result would have been the same, right? I think that's right, Your Honor. Yeah, and that's another way in which the Court of Federal Claims' opinion just doesn't make any sense. Can I ask you about the information stuff? Because that, at least, is a little clearer so we can talk about it. That was they tried to mitigate it, and then there's also the arguments that, one, it was stale information by 2022. Two, they didn't get it, although they said they got it two weeks or only two weeks beforehand, which I guess they said was insufficient. I don't know who offered what proof up. So what was the Court of Federal Claims' conclusion of the inadequacy of those remedial actions? Right. Well, I think that's where the Court of Federal Claims erred, is that they said that they disagreed with the agency's determination that the information was stale and not competitively useful, right? And the agency made that determination on three separate occasions. It did three separate OCI reviews, one in connection with the 2022 solicitation being issued, one when the protesters protested, and then the SDRO, which is the appeal. And at all three places, the Postal Service found this information was stale, not useful. The Court sort of disagrees with that but doesn't really say why. What's the standard of review for the Court to apply to the agency's conclusion on staleness? Isn't that a bachelor finding? It's a highly deferential, rational review finding. That would be the standard. And it's unclear from the Court's opinion. But the record supports it, and the trial court can't disagree with it. That's correct, Your Honor. And so the trial court apparently thought that these documents might still create an unequal access to information. But I think what the trial court was really concerned with, they weren't so much thinking about whether these documents were stale or not. What the trial court was looking at, the main thing that seems to have motivated the trial court, is that MSA had a, there was a taint from the 2022 solicitation that carried over, excuse me, in the 2020 solicitation, that carried over into the 2022 solicitation. And the Court thought that Postal needed to try to mitigate that taint. And that's really where the Court of Federal Claims is coming from. And we think that's erroneous on a number of levels. I mean, number one, this taint concept is found nowhere in the case law. Number two, Postal did a lot to mitigate whatever incumbent advantages MSA may have had. And that's where the Court made a really critical error, is that it thought, at least its opinion seems to suggest, that the only mitigation that Postal did was the mitigation ordered by the end of the process. The SDRO ordered additional mitigation. But the Court of Federal Claims completely ignores all of the mitigation that Postal did before we got to the SDRO, including restructuring the entire evaluation scheme for the solicitation to give other offerors a better opportunity. So I see that I'm well over time. No, no, no. I think I've got more questions. You don't have to go that easy. In the Court of Federal Claims opinions, there are numerous references to government concessions. But there was one that they attributed, the Court of Judges attributed to you. And I'm trying to look back. On page 30, APPX 30 of the Court of Federal Claims opinion, they say the government does not articulate why MSA's past performance is still considered. Despite MSA's own admission, it would be reasonable to preclude evaluation of MSA's 2020 contract performance. Yes, Your Honor. I wouldn't call that an admission. I think what I said at the hearing was I said that there are different ways in which MSA's ostensible advantage could be mitigated short of disqualification. And I suggested one possibility. And by the way, as I recall, this was at a hearing well before, you know, in time before the ultimate hearing where the court reached these conclusions. But the point that I made is that there are a lot of, there was a lot of opportunities for mitigation available short of disqualification. One of those would have been to not allow MSA to use the past performance that it gained on the 2020 contract. So the suggestion was made that this was a possible mitigation strategy that Postol could have undertaken. And in fact, ultimately did. You know, Postol did undertake that mitigation strategy on the SDRO's order. They didn't fully ban MSA from using all past performance references, but they did, you know, narrow the time period. And so that was the. And can you clarify, just moving on to another topic, which is the FAR, the applicability of FAR and the applicability of the SPP and why that matters and what's going on. What was the, what was your understanding throughout the court of federal claims? What was the government's position? FAR doesn't apply, SPNP apply, but that the exception in FAR should also be applicable to the Postal Service, because clearly we all know that the Postal Service is under looser standards. Is that the government's position? Basically. I mean, I think, I think the government's position is the SPNPs and this is MSA's position too. The SPNPs are not binding because they specifically say these, these SPNPs do not create any rights against the Postal Service procedural or substantive. And so the only thing that's binding on the Postal Service is the Postal that's relevant here is the Postal Reorganization Act and then 39 CFR Part 6.1. So I had understood that there is not in this case an argument that APA intervention is required on the ground of a violation of a statute or regulation. It's entirely about arbitrary and capriciousness so that if the Postal Service has a set of non-binding pronouncements and generally says we kind of follow these, then if it, then it is subject to reversal, call it that. If it acts irrationally in departing from it without a good explanation. So the non-binding nature, I don't, feels to me like it's neither here nor there. Is that an incorrect description of what's at issue? I, a little bit incorrect and I, and I would say this, which is that if that you, the court can look to the SPMPs to determine, to the non-binding SPMPs to determine whether the agency acted rationally. But I think that it should not take a, you know, as much of an exacting or slavish approach to what they say given that they're not binding. So, you know, for example, if the Postal Service were to say, oh, well, we don't believe in OCI's, you know, we don't care about OCI's. Well, that would likely be irrational because the SPMPs, you know, suggest that you should reverse. Right. But I, but I think to, to really, you know, to really break down and parse the language of the SPMPs is, is maybe not what's supposed to be done given their non-binding nature. But I think the more important point here is that even if the SPMPs were binding, they weren't violated because the SPMPs clearly give the agency discretion to disqualify. They say, they say the agency may disqualify. And the court of federal claims came in and said, basically said that they had to disqualify in this case. I also think that it was perfectly rational for the agency to look to the FAR, even though the FAR doesn't apply to the Postal Service, but to look to the FAR as a, you know, more highly detailed and more developed body of law to look to the FAR for some persuasive authority on how they should deal with OCI's. And ultimately the agency thought that MSA qualified for the development and design exception. Well, except I'm confused about that as well because on APPX 46, the court says that the government twice conceded an oral argument that under FAR, FMSA would be disqualified. And that was confusing me because I thought the government's argument was look to this exception and this exception should at least be applicable to SPMP. And so there we are on design and development. Now I know the district court had other issues with design and development and the scope of that, but game over, at least in terms of the government's position, if they say it would have been disqualified under FAR, I mean, you're right. We're under SPP, but that was quite a, that was concession, right? No, I think the trial court kind of misconstrued what the government was saying there. I think the government is saying that under the FAR and I, and I think the government actually went too far here. I think the government's a little bit incorrect, but under the FAR there is a presumption of disqualification in the event that a contractor writes the specifications of the statement of work. There's a presumption, but it's not mandatory. And so the government was conceding that. The government was conceding that. Isn't the same true of the SPP? That there's a presumption of disqualification? No, the SPMPs don't say that. They say that in the event of an OCI that the agency may disqualify. And it lists other mitigation measures that can be taken as well. And it just kind of gives them as options. But I think that, you know, getting back to what the government said, so the government acknowledged that disqualification is a presumption in the event of biased ground rules. But then the government also said, but there's this development and design exception for which we qualify for. That's all the government was saying, was saying, yes, there's a presumption of disqualification in the biased ground rules, but not, you know, if you qualify for the design and development exception, then there's no disqualification. So I think that the trial court kind of selectively quoted the government's statement at the hearing. Right. We take your point. Anything else? No. Okay. Thank you. Thank you, Your Honor. Okay, we're divided time. Yes. Good afternoon, Your Honors. May it please the Court. There's another piece of this case, and it's the only piece that we briefed. I heard, didn't hear a word of that from Mr. Bradel, and that has to do with the structure of the contract. This was the reduction of the look-back period. I know, but since you're representing the government, can we ask you other questions we may have about this case? You can ask any question you like, and I would love to comment on the OCI, but I have nothing to say in rebuttal on that point, the only point that we briefed. Please. What do you have to say about the FAR and the SPP? I mean, do you agree with essentially what your friend was saying, that the SPP is non-mandatory and has allowed enormous flexibility, much more so than the FAR, and that at a minimum you can look to the FAR at the exception, which even under FAR, there's got an exception for development and whatever, and that applies here as well. Do you agree with that? So generally, I agree with what Mr. Radel said, absolutely, that these are guidelines, and I also agree with Judge Taranto's assessment of this, which is if this were a case where the protester were to say there's been a violation of law or regulation, and the regulation were the SPP's, we'd say, huh, that's not a regulation. You can't go down that road, and if you had, you'd have to prove significant prejudice. What remains then is for them to say the contracting officer abused their, many contracting officers, abused his discretion, and, of course, then they have a heavy burden. With regard to design and development, it is something one of the contracting officers said, I think an SDRO said in response to an administrative appeal, cited that and said, look, we can rely on that in the same way it makes sense for the FAR to have had it in there to begin with because of our flexibility. I don't know that our brief really pushed that so far, and, of course, we haven't argued it here at all, and I'd rather not at this point. I know you quite care to share with us why you are not here defending the position. I wasn't part of the decision team, but I think basically it's rooted in the idea that the Postal Service just wanted to move on. They've been at this for, since 2019. Litigation had ensued since 2020. And presumably, if you just want to move on, and I appreciate and respect that, but, we have to write an opinion that's going to be kind of governed, potentially govern the rules of the game going forward. So, I understand that. You can move on, but there are future. A lot of this could be prospective for the government and for the Postal Service. I am not going to disagree with Your Honor at all. It may have also been part and parcel of the decision whether to appeal. Of course, only a Solicitor General can authorize us to appeal, and I'm sure there was a robust discussion, as is consistent with the robustest policies, as to whether to appeal or not. And for many reasons, we decided not to appeal. Does that necessarily mean we could not have filed a brief in this case? No, I don't believe so. Hey, let me ask you a more general question that I asked with your friend, and I should be embarrassed to ask it because it's so pedestrian, but I'll go ahead anyway. All of this stuff, a lot of the stuff we're talking about here that happened early on, the pilot program, the sort of involvement in MSA, and then the question of how you mitigate that, how different is that from incumbency? If you've got an incumbent contractor and they're bidding on the new contract, doesn't a lot of that stuff also apply? They're already set at the locations. They've already got the people hired and so forth. So explain to me the global rules with respect to bias and OCI. Well, you're preaching to the choir on this one, Your Honor. Yes, there's no trouble with incumbency per se. There is trouble with incumbency when, to turn to the ground rules here, not the ground rules, to turn to the SPPs themselves, they say, this is their definition, essence of an OCI, an OCI exists when the nature of the work to be performed under the contract may give an offeror or supplier an unfair competitive advantage. That's all that matters. In this court's case law, whether in bias ground rule cases or unequal access cases, say that the same thing. It always comes back to, I think what AMK9 and GK9 would call prejudice. It comes to that element of, was there really an unfair competitive advantage? And the big picture here is, there were so many mitigating actions taken. There were so many changes between the 2019 pilot to the 2020 contract to the 2022 contract that there's basically no unfair competitive advantages left. Help us with the specifics of what the trial court or the protester argued was the unfair ground rules from the pilot program. I'm a little confused. I think it was sort of mushed together. What the trial court argued. It really seems to me like it was just, well, they were on the pilot program, so they knew from the get-go and they were involved in formulating some of the policies or whatever. Although I think your friend said they didn't write the statement of work. But why is it, if they have knowledge of how the program is going to work, per se a violation, as long as it's not going to lead to an unfair advantage? Well, that's our argument, frankly. So what did Judge Holt find was the unfair advantage, just because they were involved? My assessment of it is that the judge, the opinion really focuses on, so at some point the judge remanded, I think in 2021, to the Postal Service saying you need to look into this. I'm sorry, I didn't hear the word you used. Remanded to the Postal Service and said you need to look into these, obviously, questions that are being raised. A guy named Franklin, he's a contracting officer, was appointed by the Postal Service to investigate. And the opinion comes back over and over and over again to Mr. Franklin's investigation. He looked at documents, he interviewed people at MSA, at TSA, within the Postal Service, trying to figure out what exactly is going on here. And he identified some things that had to be mitigated. Bias ground rules is when a contractor, essentially as a consultant usually, writes the specification, and of course bias might mean that it writes the specification in its favor. So, for example, if MSA were writing a specification and it knew it was the only contractor of this sort that had both canine detection capabilities and alarm resolution capabilities, and they wrote a specification and said, this is the way to go, this is what you want, and the Postal Service did that and nobody else was capable of doing it, that's bias ground rules. Unequal access is sort of a classic case where somebody slips somebody... Just to be clear, even in that situation, the government, I hope, I guess, should be able to justify that combination, no? Right. So suppose it's the difference between planes going up and not, if there really was a good case for integrating those two functions. The fact that there was only one company that could do it... Oh, right. Sure, there could be a justification or a decision made for a sole source procurement, which might be protested, and then of course we'd be in a different kind of case. Why would they have to go to a sole source procurement if it was determined that this was in the best interest of the government to structure a contract this way, and it wasn't just simply an arbitrary choice by the pilot project participant to structure it in a way that it made it clear that they were going to get the contract? Why couldn't the government still issue it as a competitive contract? Because they've determined, based upon all of this, that the best interests of the government are having these two functions performed together. I think you took away the problem by saying that it was first issued as a competitive solicitation, also by saying it wasn't arbitrary and capricious. That's what I mean. You troubled me when you suggested that they needed to go to a sole source procurement because those have different things, and they have to justify them, and they're challenged for different reasons. If they'd done the pilot project, which they did, and throughout the pilot project, the government had determined and directed them, or in consultation together, they said these two services need to be bundled, because if they're not, there'll be inefficiencies, safety problems, all that kind of stuff. The fact that they write it that way, even with the knowledge that they're the only one that can do it, does that mean it's a biased ground rule, or is it a biased ground rule that's still justified? By definition, I think that would be a biased ground rule case, for sure. I probably went too far, because I was probably thinking in a far world when I said there'd be a sole source justification. Nonetheless, if there was a sole source, you can imagine somebody would figure out a way to protest that. I think what you're pointing to, Your Honor, both Judge Tremento and Judge Hughes, is the flexibility that's embedded in the SP&Ps. For example, first of all, they're looking only to see whether there is an unfair competitive advantage. If they see that, now the Postal Service, I wanted to say regulations, the Postal Service guidelines, the SP&Ps, talk to some very broad measures that must be taken. Mitigation actions, for example, at SP&P 7-15.2, say mitigation actions may include, and for sure there is a possibility, may, if it becomes apparent where proposals are received and that participation by a particular offer could lead to an organizational conflict of interest, the offeror may be disqualified. But other options are the adoption of other measures to ensure as fair a competition as possible.  Furthermore, even that loose guideline is tempered by the following. In the SP&P, this is still at 7-15.2, the contracting officer may take actions necessary and in the interest of the Postal Service and the offerors to avoid, neutralize, or mitigate the potential or apparent conflict of interest. It goes on to say that the contracting officer has to write an analysis which would include, quote, a consideration of the potential benefits and detriments to the Postal Service, including consideration of the overall business and competitive interest of the Postal Service and how the appearance of an OCI may affect them. So yes, even if the Postal Service were to determine there was an OCI, it would first have to decide. But the hypothetical we started with is assuming that you get affirmed on the things that you're here for in terms of the contract split up. Right. And even under those circumstances, am I right, the Court of Federal Claims still says these are OCIs that are not immedicable? Is that your understanding of where we are? Yes. And I think the Court's error was it in effect conducted fact-finding. Its focus sort of stopped with C.O. Franklin's October 21, 2020 analysis, which sort of served up a problem to other contracting officers. In the meantime, further analyses were undertaken, further investigations were undertaken, further mitigation steps were taken. So what's missing then is the causation analysis, which is fact-finding between what was first served up by the remand and then further developed by C.O. Franklin in 2021 and then acted upon in a very responsible, very thorough way by at least four Postal Service. Well, some of the incentive to do – some of what drove that, I think, is the look back to 2020 and to view this more as a continuous thing and that a lot of the 2020 stuff hadn't been remedied, arguably if one assumes there were problems there. And that bled into the 2022 solicitation. Is that what you understand? That's right. So one of the first things C.O. Franklin said was the 2020 awarded contract, which was awarded, I think, in November of 2020, it had more years onto it, but C.O. Franklin said this has to be ended after one year and a new solicitation has to be issued and further investigation of these allegations. Right, so there was clearly taint. So we're looking at an acceptance by the Postal Service, at least, that there were not good things happening earlier and then the question becomes whether, in addition to everything else, whether that taint of what had happened before bled into the 2022 solicitation.  The finding was done by a contracting officer with respect to a business disagreement filed by American K-9, Global K-9, and MSA. Each of those appealed and then a higher ranking official, two total across these three, two total SDROs, Supplier Dispute Resolution officials, then looked further at what the contracting officers had concluded and then looked back at another analysis done by the contracting officer Baker who looked very specifically at these alleged advantages and examined whether in each case they were stale, they gave an advantage, whether documents they had could be turned over. Let me go back to where we started, which is I appreciate your candor in telling us the Postal Service just thinks it's time to move on. They've got real work to do. What would happen if we were to remand this or change it? I mean, on the ground, in terms of the practicalness of the Postal Service getting this work done, which seems like it's pretty important stuff. Well, that's a twisted tale as well because although the Postal Service had hoped to move on, MSA eventually was disqualified by the judge's order and we're up on appeal in this case right now. And ultimately there was a competition for MSA's various contracts. There's several around the nation. And it was replaced by a company, I guess I can say their name, K2. K2 then took over the contracts. Since then, I think the order is public because K2 knows about it, K2 was disqualified by the court and at the same time, around the same time, shortly after that decision... By the court? The court issued an injunction saying that K2 couldn't, for different reasons, having nothing to do with what's going on here, could not perform. Which court? The court of federal claims, same judge, Judge Holt. In the meantime, the Postal Service was filing periodic updates as ordered by the court, asking, how's this thing with K2 going? Because now American and global were protesting K2's awards. At the end, Judge Holt disqualified him, but about the same time, the Postal Service determined to terminate K2 for default, basically. So who's doing this contract? The Postal Service is. Oh, you're performing it? MSA. But the other sides, they're still running the contract. They have different kinds of contracts. So there's the alarm detection contracts, which MSA has, and they know far better than I their contracts. There's like 9 or 10 clusters around the country. But there's an injunction. So is there life in the injunction? Is there flexibility in the injunction? It takes a while, and Judge Holt understood, you just don't turn these things on and off because of the national consequence of having letters go on planes that might have IEDs on them. So the split-up is still in existence, right? The split-up, yeah, that was what happened, basically. But MSA certainly has some contracts. They were disqualified. K2 got some of those contracts. They were terminated. And so it takes a while to transition. So MSA, and Mr. Cradle can explain it a lot better than I can, has basically remained on the job because it's difficult. You just don't stop one day and somebody else steps in the next day. For all of them or just for the portion that were split up today? For the portions that they had. Who's doing the rest of it? Who's doing the K9 stuff, the people that were disqualified? Yeah, this is the attorney for American, and this is the attorney for global. And they've got, in fact, the K2 contracts that took over from MSA, they've now been awarded to MSA and to global and American who can speak in far greater depth and expertise than I could about this. But through it all, MSA, from the result of this case, has had to stay on the job. Okay, and is that changed by an affirmance in our case? I mean, does that speed up? Or eventually, if we were to affirm Judge Holt's opinion, then you've got to go out for a new solicitation, right? You've got to do this again? It would depend. So if you affirm MSA is still off the job and the transition activities that have been taking place would still continue. If you were to reverse. But if we affirm, you're obligated to go forward and do a new contract solicitation, right? For what they're doing. For what MSA is doing. Oh, they've already been taken off those. Well, they're on the contract only as a transition contractor to fill in until somebody else can get the work. Well, that's what I mean. So if we affirm, what's the next step? A new solicitation so that somebody else can get the work? I think that's already happened, right? Their work was already re-solicited and was assigned to somebody else. That one somebody else has now since been terminated. No, I know. That's why I said you've got to do it over, I guess. Okay, and what are you going to say if we reverse? Oh, if you reverse, then we'd have to go back for a remedy. One possibility is an injunction, and perhaps the Postal Service might argue an injunction is not warranted. It's just too late for an injunction. As an equitable matter, it's too late. However, MSA is already on the job, so I'm not sure how that argument would go. Wait, if we reverse, they're back in business, right? Right. Well, there's two remedies in a bid protest. One is an injunction, which basically would put them back on the job. The other is a bid preparation clause. If it's too late, if it's a matter of equity. Because the contracts have already been awarded to them, it's too late to give them back to them. It could be. I don't know if they've got their – they have a different kind of contract, the canines, right? But they used to have the canines, or they were originally – That's a big one, only having one. They originally did, right? Yeah. It's been figured out. It sounds like there's going to be disruption no matter what we do. Perhaps our decision-making about whether to brief this case was naive in the service of thinking let's just move on. If I can just say one more thing, and really – The troubling part for me, and I understand that, that at some point, even if you disagree, the government's going to move on. But does the government really want to live with the legal impact of the trial court's decision if we affirm it? Doesn't that give it some imprimatur of correctness that I assume you don't agree with? We don't agree with some of the things that my friends at this table, the appellees, are saying in defense of the claims court's decision. So it's one thing to have had a difference of opinion, to declare something arbitrary and capricious, which, of course, we disagree with. But we did an appeal, so I'm not really authorized to speak too much about that. The things I wanted to say today, however, have to do with the law in general, and I think that's what you're referring to, Jesus. And one is the idea that prejudice can be presumed. I think when AMK 9 says that, so for example, at 41 of their brief, this is American K-9, says, the possibility of benefiting from biased ground rules is sufficient to establish prejudice because appearance of impropriety is enough, citing the Turner case. That just completely eliminates their burden. So there's two kinds of prejudice, and I think they're being conflated. If we're talking about the prejudice that must be shown in the case of a violation of regulation or law, the protester must show significant prejudice. That never goes away. That's their burden, and there's nothing in this case that will change that one way or the other. If they're talking about the idea, and I think they are, that they don't have to establish what the postal rule calls an unfair competitive advantage, that's wrong. That is the heart, that is one of the elements of proving an OCI. Not only that you had unequal access or there were biased ground rules, but that there is an unfair competitive advantage. And this court has stressed this in a number of cases. Two, I just have in my notes here, one in the case of unequal access, PII Corporation. The court held there was no OCI. When the protester failed to show the awardee gained a substantial and unfair competitive advantage through unequal access to information. That's a far case, same principle though. In a biased ground rules case, the Turner case, this court affirmed the Court of Federal Claims for properly requiring hard facts for a failure of the protester to show that this was based on a GAO analysis. They were criticizing the GAO for failing to demonstrate by hard facts that the awardee there would have, or the award would have given Turner an unfair advantage. It went on to say that it congratulated the contracting officer by applying a proper standard and saying, in contrast, the court concluded the CO carefully assessed the information that AECOM, one of the companies there, may have had access to and determined that this information not only lacked competitive utility, but was also disclosed to all other authors. So in all kinds of cases, whether it's FAR based or Postal Service based, SP&P based, they still have to prove that there has been an effect, that there has been an unfair competitive advantage. That's all that matters. So to the extent that American K-9 is arguing they need not show prejudice, meaning they need not show an unfair competitive advantage, that's presumed they're wrong. What they're relying on are cases having to do with an appearance of a conflict of interest. That's not this case. Judge Holt didn't find there was an appearance of a conflict. He found a conflict. If that's the case and hard facts show there is an appearance of a conflict of interest, then the prejudice or the unfair competitive advantage takes care of itself, because the court says this is an apparent conflict of interest, meaning there is going to be an unfair competitive advantage. So to the extent the court is writing it all, whether to affirm or to deny, we would just ask that those ideas don't be conflated. The general idea of prejudice that must be shown in the case of violations of regulations or rules, and the second part of every OCI case, which is a demonstration, you might call it prejudice, that there has been an unfair competitive advantage. And then the last thing, which Mr. Bradel handled perfectly, was to say the court said at page 38, the SPPs prescribe a specific remedy if it becomes apparent OCIs are probable. Disqualification. It's not what the SPPs say. What they say at 7-15.2 is if it becomes apparent when proposals are received, that participation by a particular offeror could lead to an organizational conflict of interest and unfair competition, the offeror may be disqualified and his proposal rejected. Earlier I read some of the other principles that sort of temper that decision or give contracting officers wide latitude, as this court's case law already provides the contracting officer. That's all I came to say. Any further questions? Thank you. Class dismissed. Thank you. All right. Mr. Gilliam. I'm sorry. I'm sorry. I confused it. Mr. English. Thank you, Your Honor, and may it please the court. I'm Brad English. I represent one of the appellees, Global Canine Protection Services. I want to pick up at a point where Mr. Gillingham left off, and he was talking about the SP&Ps and the direction for the contracting officer to look into these OCIs at the beginning of a procurement, when proposals are received. Well, the original 2020 solicitation required offerors to identify OCIs. Some people in the Postal Service didn't know about this consulting agreement that was undocumented with MSA, but MSA knew about it and said nothing. And we litigated in front of Judge Holt for over a year about OCIs, with MSA insisting that there was no problem at all and never revealing the fact that there was this secret undocumented consulting agreement where they helped set up the entire program. And I think that permeates Judge Holt's analysis down below. And so when we look at the biased ground rules OCI, Judge Holt didn't make that up. And if I look at Appendix 103-677, this is the contracting officer Franklin's decision from October of 2021 under subsection C. He's talking about the emails where he finally discovers this undocumented consulting agreement. He sees emails that reflect it. And he says, These emails reveal details that were not previously known and demonstrate that MSA appeared to have both unequal access to information and biased ground rules OCIs. And he goes on and explains how MSA was fundamental or instrumental in setting up the entire 3PK9 program. We don't know all that they did because it was never documented and MSA tried to sit on that information. All we know about it is what C.O. Franklin was able to dig out after a year or more of this litigation in October of 2020. And so the biased ground rules OCIs that C.O. Franklin was focused on really related to these documents that MSA owned. They didn't just draft them, they owned them. We focused a lot on what we called the playbook, which was a set of instructions for how the canines were supposed to do their work that MSA created either before or after the pilot program. It was certainly part of the pilot. But we're not focused on the pilot itself as the root of the problem. It's what happened after. For months after the pilot program, MSA is continuing to work in this undocumented consulting role. And then they win the 2020 competition and they get both the canine screening and the alarm resolution. There were two parts of it. They won both of them. They performed throughout this litigation. Can you go back to what was it about the 2020 solicitation? By what was it, I mean very specific. Like with page sites, clause sites, whatever. That was the result of the MSA involvement in the design of the specification. The one thing I can point to right now. Maybe you got this from me an hour ago or something. When I hear biased ground rules, the first thing I want to hear is what is the ground rule. To me the ground rule has to be something in the solicitation, whether it's evaluation criteria, whether it's requirements, something. First identify them and then say why were they biased. I'm not sure that the 2020 solicitation is in the appendix. Parts of it are. If you look at the playbook, and you see the diagrams with the inverted veer, I think they call it, how the dogs are supposed to do their work, you'll see the same thing in the solicitation. Even C.O. Franklin says, even though they didn't write the SAO, MSA did not, what they did impacted the SAO. Again, we don't know all that they did, because this contract they had to do the consulting was undocumented. It's really not the pilot, as I was saying, that we're troubled by. It's the undocumented continuing consulting role, where even C.O. Franklin says they're instrumental in setting up the whole thing. Then they perform it for two years. Judge Holt starts with the 2021 remand decision, where the contracting officer says there's both types of bias. There's biased ground rules and unequal access OCI. This may be quibbling, but I thought, at least MSA doesn't think that this is quibbling, but Franklin said something like unequal and or, the possibility of. In one place. He wasn't quite definitive, is that wrong? In one place he said and or, but the site I just read, AR103677 is in his decision and he says, MSA appeared to have both unequal access to information and biased ground rules OCI. The way he's written it, when he talks about the fundamental role that MSA played, I think it would be impossible for Judge Holt to conclude there wasn't a biased ground rules OCI. He got this case back at the pre-award stage in 2022, when we go back to a new solicitation. Remember the corrective action was to shorten the base period from three years to two. MSA continued to perform and then they did a re-solicitation and they re-did it. The whole time MSA is performing. They are still performing on some of the clusters. Because remember the 2022 solicitation divided up the screening into geographic clusters. They're still doing some of the work that K2 couldn't do. And the work has been awarded, to clear up one point, to AMK9, American K9 and to Global K9. We are working now and they are phasing out, as I understand it, MSA. But Judge Holt said, I've got these conflicts of interest. How have they been addressed? And he pointed specifically to the taint of incumbency. And it's not the pilot program. It's the fact that they were already rolled out across the country. Because after the pilot program, while they had this consulting agreement no one knew about but them. They got the contract and they were operating at all these airports. And so when you look at the four factors in the solicitation. So it was all, it was all mushed up into one, right? It was. They got the 2020 and they shouldn't have had the 2020. And therefore all of this is pent up and not, I guess not walled off or not remedied by whatever the government did in terms of splitting stuff up and also the solicitation. Right. What should have happened, Your Honor, is MSA should have raised its hand when the 2020 competition came out when it wasn't a sole source and said, like the solicitation required, hey, we've got these OCI issues. We've got an undocumented consulting agreement that even the contracting people at the Postal Service didn't know about except for the one person whose name we can't say. And they should have said that. And at that point, Postal Service could have swept in and done something. But nobody said anything. Postal because they didn't know. MSA because it was hoping nobody would find out. And this rocked forward for two and a half years. So when there's another competition in 2022, may I finish answering, Your Honor? Sure. When there's another competition in 2022, they've got built-in advantages beyond past performance. They don't have to transition because they're already everywhere. They don't have to get badges, which has become a problem for some people performing this contract because they've already got them. But wouldn't that be true if the 2020 had been properly awarded? I think it should. That's just an effect of incumbency. I guess what I'm really asking is, is it your view that let's assume 2020 did have an improper OCI and they shouldn't have gotten it. Once that happened, did that mean they could never bid on and get another one? I don't think never. But remember, the SDRO said that the SAL was not a major departure. So it's essentially the same contract. And so I do think for purposes of the recompete, which was corrective action, once it was finally revealed that there were problems with the 2020 solicitation, I don't think they were eligible for that. Now, when this one's over, I think all of this can be addressed. But the fundamental problem is it starts with MSA's silence. They said nothing when they should have disclosed this OCI. They let Postal Service rock forward, and now we've got a mess on our hands. As Your Honors have been- Can I just ask you- Certainly. You've said several times that MSA should have revealed, even in the lead-up to the 2020 solicitation or the bidding, what's the authority for that? Solicitation. Can you show me that page? I don't think I have a page site for you, Your Honor, because I'm not sure that page is in the record. But there's a portion of the 2020 solicitation that deals with OCI's. It required all bidders to reveal any OCI's they believe they may have. And MSA said nothing. Is there any obligation? Because there were two parties to whatever happened. One was MSA and the other was the government. Is there any obligation on the government to disclose this? I think there would have been an obligation on the government to at least address it, but they didn't know. If you read C.O. Franklin's report, he explains that C.O. Baker didn't have access to the information he discovered. Somebody knew, right? There had to have been two to do this. If there was an OCI on their point of view, there was somebody on the other end of that OCI, right? And I think the person on the other end, Your Honor, that's correct, was the person whose name we can't say. He was the one working with the Postal Service, excuse me, with MSA to do all these things, who sent the documents that MSA had that they shouldn't have had in 2020. And he was excluded or supposed to be excluded from the re-compete, but then he participated in the Lessons Learned panel, which in fact informed the 2022 solicitation. And so I don't think it's fair, and certainly I don't want to speak for Mr. Gillingham, but I think he would say that given the lack of information, the fact that they didn't follow their processes, and Judge Holt said that multiple times, they didn't follow their processes in putting this consulting agreement in place, that's where the problem started. Because they could have addressed it then. Yes, but there's deference owed to the C.O., and the C.O. knew all of that by the time we get to the 2022 and to the years after. They find that there were problems in 2020, and nonetheless, they found that those problems were mitigable, and they decided, and we have to decide whether that was irrational or arbitrary, right? That's right, Your Honor. And so, may I respond? Sure. So Judge Holt explained his analysis, I think, in pretty good detail there. He explained all the ways in which the past performance change that the S.D.R. ordered didn't address all the tainted incumbent. I understand. Actually, let me ask you then. I asked your friend, did you read Judge Holt as saying this issue was immedicable? Because I was confused. It seems like he did say that, but he also preceded it by an analysis suggesting that the changes were insufficient and even maybe offering up other changes that could have or should have been made. So how do you read that? I think he walked down the mitigation path, because certainly the unequal access can be mitigated. There's no dispute about that. I think his finding was it wasn't mitigated, because nobody tried to address the tainted incumbency, i.e., past the pilot program, the performance that's even ongoing. And therefore, he found the taintedness stuff made it immedicable? Right. And I think there's a clause at the end that he says, I'm not saying there's never a situation where you can mitigate it, but this one was immedicable because the salve for the 2022, the statement of work for the 2022 solicitation, by the government's own admission was not a major departure. And I think Mr. Gillingham's predecessor admitted in an oral argument it was 95% the same. So if they've got a biased ground rules OCI in 2020, which C.O. Franklin found, and that's where Judge Holt started, hasn't been addressed. And he walked through all the ways it hasn't been addressed. And I don't think that's improper fact-finding. One of the grounds for arbitrary and capricious action is if the government doesn't confront something, an obvious part of the problem. And it's an obvious part of the problem that they're performing this work three years in, or two years in at that point in time, and all the benefits they're going to get from the incumbency they never should have had. And I think that permeates Judge Holt's decision. Thank you. Thank you, Your Honor. We'll restore four minutes. Get out of your way. Your Honor, briefly, the agency did address detainee incumbency. They restructured the solicitation. The whole evaluation started splitting it up into regions and clusters, splitting off the explosive detection canine work from the x-ray work. All of that was aimed at making it easier for other parties, other offerors to perform, to deal with MSAs. So Postal addressed the detainee incumbency. It's just that the Court of Federal Claims thought that they could do more, but never explains how the Postal Service's decision was irrational. And, in fact, Postal says why they couldn't do more, because if they did more, if they did some of the things that Judge Holt suggests, it could have increased price, could have led to not having the best contractor available. So the bottom line is that Postal made a rational decision where they addressed detainee incumbency. They didn't go as far as maybe my friends might have liked, but that was a rational decision they're allowed to make. And nowhere does Judge Holt say where Postal was irrational in its determination that there was no longer any biased ground rules. That just doesn't happen. Judge Holt's decision never says anything about what the bias was. My friend said a lot about this consulting contract, and his main point was, well, we don't know what might have happened. Well, first of all, we do know what happened. Those four documents came out. That's really the work that MSA did. They produced those four documents that Postal reasonably found no longer provided them an advantage. That's what they did. Anything beyond that is innuendo, and as we know, an OCI cannot be based on innuendo. Do you agree that you had an obligation when the 2020 solicitation was being done to make it known to, I guess, to the government and maybe to other bidders, but to make it known that you had been engaged in this consultation work? I think there's a bit of a factual dispute there. As I recall from that, we did make it known. We didn't make it known in all of the detail, but there was a form, as I recall, in the original solicitation where MSA suggested, I think they suggested a moderate possibility of an OCI, and Postal evaluated that and said there's no OCI. Did you disclose the underlying facts of what you had done? We did not. Yeah, that's where it was different was that MSA filled out the form, and I think the form didn't really ask about it. Somebody else at the Postal Service knew. Somebody else at the Postal Service knew. The left and right hands weren't communicating at that point. That's correct, yeah. And it's not just one person. There were multiple people at Postal that were involved with this consulting contract. I just want to say one last thing on the remedy that we're asking for here, because that was subject of some discussion. But just to clarify, MSA is still performing. They will be off. They will be done performing within the next several months because of the transition. And so at this point, I understand that AMK9 and GK9 are performing. MSA is performing. There's been a lot of transition at the different sites. But it would certainly be possible if, Your Honors, were to reverse the Court of Federal Claims to stop the transition of MSA off. Who's set to take over yours? I'm sorry, Your Honor? Who's set to take over what you're performing? Different contractors. So the last time when this contract was reawarded, there were nine clusters. Is it any of them? It is, Your Honor, yeah. So when this contract was reawarded, there were nine clusters. MSA got five, K2 got two, and AMK9 got two out of the nine clusters. K2 has now been kicked off. And we're in the midst of transitioning from MSA. Originally having everything has been transitioning so that they all have it. And so it's in the middle of transition. Are you disqualified if they resolicit these contracts? Are you precluded from rebidding? Well, I mean, we would say no, of course. Under the order that's on review here. The order doesn't say. It's not specific as to that. But I think the point is that each solicitation has to be evaluated on its own. Is there an unfair competitive advantage? That's what the SP&P say. And that's what Postal did with 2022. They said, yeah, there was a problem with 2020, we acknowledge it. But we're in 2022. And everything that's happened since then with the information going stale, these documents not being relevant anymore, there's no longer a bias and we have taken steps to mitigate the tainted incumbency. Thank you. Thank you. We thank all sides. Appreciate the input. Thank you. Case is submitted. That concludes our proceedings.